# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                                        **Case No. 16-CR-102**

**ROBERT CRUMBLE, JR.**
    **Defendant.**

## DECISION AND ORDER

Defendant Robert Crumble, serving a 102-month prison term for armed bank robbery, moves for modification or reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Crumble relies primarily on the COVID-19 pandemic, but the record shows that he is a healthy young man who declined the vaccination offered by the BOP. Reducing his prison term would also undermine the goals of the sentence: just punishment for an aggravated offense, specific deterrence of an offender who committed his crime while on probation, and protection of the public from further robberies. I accordingly deny Crumble's motion.

## I. FACTS AND BACKGROUND

Crumble and two co-actors, Elijah McGee and London Johnson, robbed a TCF Bank branch in Elm Grove, Wisconsin. (PSR ¶ 8.) McGee walked into the bank unmasked and initially went to the service counter and appeared to write something on a bank slip. Crumble, wearing a mask, came into the bank shortly after McGee. (PSR ¶ 9.) Upon entering the bank, Crumble immediately leveled a black shotgun at the two tellers behind the teller line and yelled: "Don't move or I will shoot you." McGee, who was at the service counter, then approached the teller line as well and pointed a long barreled revolver at the tellers. Both men continuously

pointed their firearms directly at the two tellers and demanded cash. At one point, Crumble jumped over the teller counter and pointed the shotgun at the head of one of the tellers. Both McGee and Crumble proceeded to take the cash being pulled from the teller drawers, a total of approximately $7239. (PSR ¶ 10.) The two men then ran from the bank and entered a getaway vehicle driven by Johnson. (PSR ¶ 11.)

After bank surveillance photographs were released to the public and appeared in the news media, McGee turned himself in to the Milwaukee Police Department. McGee later admitted his involvement in the robbery and identified Crumble and Johnson as the other participants. (PSR ¶ 14.) Police located the getaway vehicle, finding inside it three 12-gauge shotgun shells and a black knit skull cap bearing the same logo as that worn by McGee during the robbery. (PSR ¶ 15.)

Police subsequently arrested Crumble, and in a Mirandized statement to law enforcement he identified himself as the masked robber who entered the TCF Bank with the shotgun. He also identified McGee as the first robber who entered the bank, and Johnson as the get-away driver. He said the trio split the proceeds from the robbery equally, with each receiving a couple thousand dollars. (PSR ¶ 18.)

Crumble pleaded guilty to armed bank robbery, 18 U.S.C. §§ 2113(a), (d), and brandishing a firearm during a crime of violence, 18 U.S.C. § 924(c). Just 21 years old at the time of sentencing (PSR ¶ 45), he had a prior record for carrying a concealed weapon, for which he was on probation when he committed the instant offense (PSR ¶ 37). Crumble "described his current health as good overall. He denied any prior hospitalizations, chronic medical issues, or current prescriptions." (PSR ¶ 57.)

The sentencing guidelines recommended 33-41 months on the robbery count, and the

statute required 84 months consecutive on the firearm count. (PSR ¶¶ 79-80.) I found that a substantial prison sentence was needed to reflect the seriousness of the offense, in which the defendants pointed weapons at and threatened to shoot the tellers. Prison was also needed to deter Crumble, as being on probation did not suffice, and to protect the public from further robberies. I did take into account his very young age, his family support, and the fact that he had not served prison time previously. Under all the circumstances, I found a sentence of 18 months on the robbery count followed by 84 months consecutive on the firearm count for a total of 102 months sufficient but not greater than necessary to satisfy the purposes of sentencing. (R. 36 at 4; R. 51 at 12-13.) Crumble is currently serving his sentence at FCI McKean, with a projected release date of May 13, 2024.[1]

On April 5, 2021, defendant filed a pro se motion for sentence reduction. (R. 53.) I referred the matter to Federal Defender Services ("FDS"), pursuant to the court's standing order regarding First Step Act motions, but FDS declined to supplement the pro se submission. (R. 55.) I then directed the government to respond and permitted defendant to reply. (R. 56.) The matter is ready for decision.

## II. DISCUSSION

**A.     Compassionate Release Standards**

Section 3582(c)(1)(A) authorizes the district court to grant what is commonly known as "compassionate release." The statute provides, in pertinent part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden

---

[1] https://www.bop.gov/inmateloc/ (last visited May 21, 2021).

3

of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i). The statute contains three requirements: (1) the defendant must first make a request to the warden before applying to the court; (2) the defendant must then demonstrate to the court that "extraordinary and compelling reasons" warrant a reduction in his sentence; and (3) the court must determine whether, even if such reasons are shown, a reduction of the sentence would be inconsistent with the applicable 18 U.S.C. § 3553(a) factors. United States v. Cole, No. 08-CR-327, 2021 U.S. Dist. LEXIS 2404, at *5 (E.D. Wis. Jan. 7, 2021).

### 1. Exhaustion

Before 2018, compassionate release required a motion from the BOP. United States v. Sanford, 986 F.3d 779, 781 (7th Cir. 2021). The First Step Act of 2018 amended the compassionate release statute to permit the court to adjudicate a motion directly from the defendant. However, the defendant must first present his request for compassionate release to the warden and exhaust administrative appeals (if the request is denied) or wait 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. Id. at 781-82. The Seventh Circuit has held that, while this "exhaustion" requirement is not jurisdictional, it is a mandatory claim-processing rule which must be enforced if raised by the government. Id. at 782; see also United States v. Williams, 987 F3d 700, 703 (7th Cir. 2021)

4

(holding that "an inmate is required to present the same or similar ground for compassionate release in a request to the Bureau as in a motion to the court").

### 2. Extraordinary and Compelling Reasons

Other than indicating that rehabilitation of the defendant alone will not suffice, Congress did not define the term "extraordinary and compelling reasons." Rather, Congress instructed the Sentencing Commission, in promulgating general policy statements regarding the sentence modification provisions in § 3582(c)(1)(A), to describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. 28 U.S.C. § 994(t). The Commission's policy statement provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1)  (A) extraordinary and compelling reasons warrant the reduction . . .
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The commentary to the policy statement indicates that extraordinary and compelling reasons exist under these circumstances:

> (A) Medical Condition of the Defendant.—
>
> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—

5

> > (I) suffering from a serious physical or medical condition,
> >
> > (II) suffering from a serious functional or cognitive impairment, or
> >
> > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
> > (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
> >
> > (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated the policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since the passage of the First Step Act, which allowed defendants to bring their own motions. Accordingly, "because the Guidelines Manual lacks an applicable policy statement, the trailing paragraph of §3582(c)(1)(A) does not curtail a district judge's discretion." United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020); see also United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of

6

extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

Giving the statutory terms their common meaning, a defendant seeking compassionate release must demonstrate that his situation is extraordinary, i.e., beyond what is usual, customary, or regular, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. United States v. Scott, 461 F. Supp. 3d 851, 862 (E.D. Wis. 2020); see also Gunn, 980 F.3d at 1180 (noting that the Commission's analysis can guide discretion without being conclusive). In the context of the COVID-19 pandemic, courts have found that modification may be warranted if the prisoner demonstrates that he is particularly vulnerable to the virus based on his age, health status, or other specific circumstances; on the other hand, courts have tended to deny compassionate release requests based on general concerns about possible exposure in prison. E.g., United States v. Dover, No. 14-CR-196, 2020 U.S. Dist. LEXIS 133340, at *16-17 (E.D. Wis. July 28, 2020); see also United States v. Thomas, No. 1:11-CR-22, 2020 U.S. Dist. LEXIS 172963, at *6-7 (N.D. Ind. Sept. 22, 2020) (explaining that § 3582(c)(1)(A) contemplates sentence reduction based on the particular circumstances of where the defendant is housed and his personal health conditions). Courts have also held that "while rehabilitative efforts alone will not support compassionate release, the court may take such efforts into account as part of the analysis." United States v. Anderson, No. 14-CR-186, 2020 U.S. Dist. LEXIS 187983, at *13 (E.D. Wis. Oct. 8, 2020); see also United States v. Hudson, 967 F.3d 605, 613 (7th Cir. 2020) (noting that the court may in deciding a First Step Act motion consider the defendant's post-sentencing conduct as part of the § 3553(a) analysis).

7

### 3. Section 3553(a) Factors

Finally, if the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified. See United States v. Saunders, 986 F.3d 1076, 1078 (7th Cir. 2021) ("Because of the importance of the § 3553(a) factors, courts are not compelled to release every prisoner with extraordinary and compelling health concerns."). Those factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). In some cases, a court may find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons warranting compassionate release and/or that release would undermine the goals of the original sentence. United States v. Bartlett, No. 06-CR-273, 2020 U.S. Dist. LEXIS 101393, at *13-14 (E.D. Wis. June 9, 2020).

## B. Crumble's Motion

### 1. Exhaustion

While Crumble does not address exhaustion in his original motion, the government has obtained a copy of his February 17, 2021, request to the warden, which sought release based on the same grounds alleged now (R. 57-2), and which the warden denied on April 2, 2021 (R. 57-3). The government agrees the exhaustion requirement is satisfied. (R. 57 at 4.)

8

## 2. Extraordinary and Compelling Reasons

In his motion, Crumble indicates that he is serving a term of imprisonment at an institution which has (or previously had) a substantial amount of positive COVID-19 cases among staff and inmates. (R. 53 at 1.) He contends that compassionate release is warranted based on this combination of reasons: (1) FCI McKean has failed in its efforts to stop the spread of COVID-19; (2) anyone, including a health young man such as himself, is susceptible to this dangerous virus; (3) his substantial rehabilitation efforts; and (4) the actual severity of his sentence as a result of the COVID-19 outbreak exceeding what the court anticipated at the time of sentencing. (R. 53 at 1.) He concludes: "These factors are insufficient on their own, but, together weigh heavily in favor of a finding of extraordinary and compelling reasons to warrant my release." (R. 53 at 1.)

Crumble does not in his original motion provide any details about the conditions at FCI McKean. In reply, he indicates that at the beginning of the year FCI McKean had the second highest number of inmates with COVID-19.[2] (R. 60 at 6.) However, the most recent data from the BOP reflect no positive inmates, two positive staff, no inmate or staff deaths, 443 inmates recovered, and one staff recovered at FCI McKean.[3] More importantly, the government

---

[2]Crumble also cites a case filed by various BOP employees against the prison. (R. 60 at 6.) In this action, filed on April 29, 2021, the employees seek hazardous duty pay based on their exposure to COVID-19. Complaint, Stewart, et. al. v. United States, No. 21-1293 C (Fed. Cl. Apr. 29, 2021), ECF No. 1. It appears the government has not yet filed an answer, and the court has made no findings on the allegations in the complaint.

[3]https://www.bop.gov/coronavirus/ (last visited May 21, 2021). In reply, Crumble claims that prison officials have ceased testing inmates at FCI McKean and that continuing to incarcerate him while the virus runs unchecked is a potentially deadly decision. (R. 60 at 7.) He provides no specific evidence in support of this claim but rather cites articles generally discussing the risks in prison. (R. 60 at 7.)

9

presents evidence that Crumble declined the COVID-19 vaccine offered by prison officials.[4] (R. 57-4.) As courts have noted, a prisoner "cannot be heard to complain about the dangers of COVID-19 in prison and then fail to take the available measures to mitigate the risk, such as being vaccinated." United States v. Tello, No. 4:18-CR-7, 2021 U.S. Dist. LEXIS 94603, at *22 (E.D. Tex. May 18, 2021); see also United States v. Toney, No. 2:15-CR-72, 2021 U.S. Dist. LEXIS 94143, at *4 (N.D. Ind. May 18, 2021) ("I agree with the overwhelming majority of cases that refusal to be vaccinated weighs heavily against compassionate release."); United States v. Garcia, No. 14-CR-20035, 2021 U.S. Dist. LEXIS 73741, at *8 (C.D. Ill. Apr. 16, 2021) ("Courts across the country appear to have consistently ruled that an inmate's refusal of a COVID-19 vaccine weighs against a finding of extraordinary and compelling circumstance to justify relief."); United States v. Greenlaw, No. 1:18-cr-00098-JAW-06, 2021 U.S. Dist. LEXIS 66670, at *16-18 (D. Me. Apr. 6, 2021) (noting that most courts have held vaccine refusal against defendants moving for compassionate release, and collecting cases); United States v. Baeza-Vargas, No. CR-10-00448-010, 2021 U.S. Dist. LEXIS 66089, at *6 (D. Ariz. Apr. 5, 2021) ("Judges of this Court, as well as others around the country, have ruled with consistency that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances."); United States v. Lohmeier, No. 12 CR 1005, 2021 U.S. Dist. LEXIS 20562, at *7 (N.D. Ill. Feb. 3, 2021) ("[The defendant] cannot reasonably expect that prolonging his risk by declining vaccination will be rewarded with a sentence reduction.").

Declining the vaccine need not automatically disqualify a prisoner from compassionate

---

[4]The BOP indicates that 20 staff members and 508 inmates at FCI McKean have been fully inoculated. https://www.bop.gov/coronavirus/ (last visited May 21, 2021). There are 845 inmates at the FCI. https://www.bop.gov/locations/institutions/mck/ (last visited May 21, 2021).

release—the court should consider any reasons provided for the declination—but in this case Crumble says only that "his decision to decline the offered 'trial-vaccines' against COVID-19 does not make a sufficient difference in the fight against this dangerous and deadly disease in the prison setting." (R. 60 at 2.) The CDC indicates that the "COVID-19 vaccines currently available in the United States have been shown to be safe and effective at preventing COVID-19,"[5] and Crumble presents no evidence that the vaccines do not work in the prison setting.

Even if Crumble could explain away his declination of the vaccine, he fails to demonstrate that he is particularly vulnerable to the virus. Indeed, in his motion he concedes that he is young (now age 25) and healthy. See, e.g., United States v. Rivera, No. 2:17-CR-43, 2021 U.S. Dist. LEXIS 27971, at *10 (N.D. Ind. Feb. 16, 2021) (denying compassionate release where the defendant was young and healthy). In reply, he references the conditions documented in the medical records provided by the government with its response, but none of those conditions (cannabis use disorder, myopia, unspecified hemorrhoids, left knee and ankle pain, epididymitis, skin rash) have been identified by the CDC as elevating the risk of severe illness from COVID-19.[6] (R. 60 at 5, 14; see R. 59 at 3, 14, 23.)

Crumble does not, in his original motion, describe his rehabilitative efforts. In reply, he indicates that he "has spent the last five years completing a substantial amount of BOP educational programs, and improving himself." (R. 60 at 9.) He attaches an inmate education

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html (last visited May 21, 2021).

[6] See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited May 21, 2021).

data transcript and individualized needs plan–program review (R. 60 at 17-19), but he fails to explain how the programming reflected on these documents supports his request for early release. Further, while Crumble has maintained a clean disciplinary record for the past six months (R. 60 at 9), he received conduct reports for fighting and possession of a tattoo gun in 2020; possession of alcohol twice in 2019; and failure to obey an order, smoking marijuana, and possession of drugs/alcohol in 2018. (R. 57 at 2-3; R. 57-1 at 1-3.)

Finally, while it is appropriate for the court to consider that prison life has been harsher during the pandemic (R. 53 at 1; R. 60 at 6), Crumble fails to explain how his experience has been altered. See United States v. Davis, No. 15-CR-136, 2021 U.S. Dist. LEXIS 76537, at *24 (E.D. Wis. Apr. 21, 2021) (rejecting a similar argument). Instead, he relies on generalities about prison life, which provide no basis for reducing his sentence. Id. at *24-25.

Considering his arguments collectively, Crumble fails to demonstrate extraordinary and compelling reasons for release. He is young and healthy, confined at a facility with no active inmate cases, and declined the vaccination that would provide significant protection against the virus. While I commend Crumble for his rehabilitative efforts, he fails to show that those efforts are extraordinary and support his request for release.

### 3. Section 3553(a) Factors

Even if Crumble could demonstrate extraordinary and compelling reasons, I would deny his motion under § 3553(a). As indicated above, Crumble and his co-actor menaced tellers with firearms, threatening to shoot them while demanding cash. Crumble increased the danger by leaping over the counter and pointing his shotgun at a teller's head. Reducing his sentence would unduly depreciate the seriousness of the offense. While Crumble's prior record is limited, he committed the instant offense while on probation. Releasing him from prison early

to supervised release would fail to provide sufficient deterrence and public protection.

Crumble says nothing about the § 3553(a) factors in his original motion. In reply, he contends that given the amount of time he has served reducing the sentence to time served would be sufficient to accomplish the purposes of sentencing (R. 60 at 8) and would create no unwarranted disparity (R. 60 at 10-11.) I disagree; Crumble has about three years remaining on his prison term, and granting such a significant reduction would undermine the goals of the original sentence.

Crumble concedes that his crime was serious but indicates that, examined through the lens of his personal history, sadly unsurprising. He contends that he was "reared in abject poverty, largely without parental supervision. His age and natural leadership ability led him to raise both himself and his siblings through childhood – experiencing unaddressed household traumas along the way." (R. 60 at 10.) Crumble does not elaborate on these difficulties, nor does he explain how they mitigate the seriousness of his offense.

In any event, the PSR paints a different picture, that of a young man with significant family support whose troubles with the law began after he disassociated himself from his family. (See R. 51 at 6, Crumble's lawyer so arguing at sentencing.) The PSR indicates that Crumble's parents were married but divorced when he was young. (PSR ¶ 46.) His mother was his primary care-giver and ensured all of his basic needs were met. His mother always worked and provided for the family.[7] Crumble described his mother as strict but denied any punishment he

---

[7] Crumble told the PSR writer that, even after his parents divorced, his father made an effort to be in his life and provided financial support. Although his father was incarcerated for a period of time, Crumble did not believe this impacted their relationship. (PSR ¶ 48.) The PSR reported that Crumble had one full sibling, then age 22 (a year older than Crumble), a student at UW-Whitewater. Crumble "said his brother always looked after him and ensured he was taken care of." (PSR ¶ 53.)

13

received was ever excessive. As he grew older, conflicts with his mother increased and he eventually moved out of her home. (PSR ¶ 47.) Crumble's mother acknowledged her children often believed she was controlling; however, she felt this was necessary to keep them out of trouble. According to her, Crumble's legal troubles began after he became an adult. (PSR ¶ 52.) Crumble graduated from high school and enrolled at the Milwaukee Institute of Art and Design (PSR ¶ 70), but when he turned 20 years old he began to spend less time at home and eventually dropped out of college (PSR ¶ 52).

The PSR also contradicts Crumble's claims of trauma. Crumble described his childhood as "normal." (PSR ¶ 50.) He attended school daily and enjoyed playing sports and drawing. In addition, his family spent time attending church and going to the movies. When asked about any significant life events, Crumble recalled when he was 13 years old one of his paintings was displayed in a local art gallery. Outside of that incident, he did not recall any other meaningful events from his youth. (PSR ¶ 50.)

Turning to the other purposes of sentencing, Crumble cites a report indicating that increasing the severity of punishment does little to deter crime. (R. 60 at 9.) However, he does not address the need for specific deterrence based on the circumstances of his case, e.g., his status on probation at the time he committed the instant offense. Crumble argues that continuing to incarcerate him will do little to protect the public, given his remarkable record of rehabilitation. (R. 60 at 9.) As indicated above, however, he fails to demonstrate that his efforts have been extraordinary. Crumble acknowledges his past disciplinary record but notes that prisoners with far worse records have been granted release. (R. 60 at 9, n.5.) While Crumble's infractions are not disqualifying, the discipline does weigh against his motion.

In sum, the § 3553(a) factors, including the aggravated nature of the offense and the

need to protect the public and deter, require that Crumble's motion be denied.

### 4. Counsel

In his motion, Crumble requests a court-appointed attorney. (R. 53 at 1.) There is no right to counsel in a § 3582(c) proceeding, although the court may appoint counsel in the exercise of discretion.[8] United States v. Johnson, 580 F.3d 567, 569 (7th Cir. 2009); United States v. Tidwell, 178 F.3d 946, 949 (7th Cir. 1999). I decline to appoint counsel here. Crumble's papers indicate that he understands the applicable law, and he has been able to adequately present his claims, with citations to pertinent authority. The government has supplied Crumble's prison medical records, and he makes no claim that he lacks access to other pertinent evidence or information. I have fully considered all of his arguments, including those first developed in reply.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that Crumble's motion to reduce or modify sentence (R. 53) is denied.

**IT IS FURTHER ORDERED** that the government's motion to seal Crumble's medical records (R. 58) is granted.

Dated at Milwaukee, Wisconsin, this 24th day of May, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

---

[8]As indicated, I referred the matter to FDS pursuant to the court's standing order, but FDS declined to supplement the pro se motion.